CARAWAY, J.
 

 hln this case, the youthful, unmarried parents relinquished custody of the child to the maternal grandparents shortly after the child’s birth. The grandparents’ action to establish custody under La. C.C. art. 133 immediately followed resulting in a consent judgment for their sole custody of the child. Four years later, the father commenced this action to modify the grandparents’ custody and establish his primary custody of the child. In support of his claim for custody the father asserts his rehabilitation, maturity, relationship with the child, and a stable home environment. He argues that his parental primacy constitutionally requires that the primary custody of the child be awarded to him. The trial court rejected these arguments and allowed the child’s custody to remain in the “excellent” environment of care which the grandparents had continuously provided. The father now appeals. Based upon the provisions for the award of custody to a nonparent under Article 133,
 
 *156
 
 we determine that the trial court correctly rejected modification of the grandparents’ custody and affirm.
 

 Facts
 

 Christopher Elliot Coleman (“Christopher”) and Christine Dale Jones (“Christine”) are the biological parents of a son Cody, born January 28, 2002. Christopher was 21 at the time of Cody’s birth, and he and Christine, who was 18, were not married. Only weeks after Cody’s birth, the couple separated and Christine placed the custody of Cody with her parents, Robert and Sharon Jones (hereinafter the “Grandparents”). After that time, |2Christine never sought custody of Cody and has very minimal contact with the child.
 

 On August 21, 2002, the Grandparents filed a petition against Christopher and Christine seeking custody of Cody. Specifically the Grandparents alleged that “an award of joint custody or of sole custody to either parent would result in substantial harm to the child.” A Judgment on Rule was signed by the trial court on September 19, 2002, and indicated that at the hearing, evidence was “adduced by the stipulation and agreement of the parties.” The consent judgment ordered that the Grandparents would be granted custody of Cody, subject to reasonable visitation privileges in favor of Christopher and Christine at the discretion of the Grandparents. The parties reserved Christopher’s and Christine’s rights to seek specific visitation privileges in the future.
 

 On March 31, 2005, Christopher named the Grandparents and Christine as defendants in a rule to change custody. He alleged a material change in circumstances based upon the bond developed through his regular visitation with Cody. He also alleged he had obtained a driver’s license, car and stable employment. Christopher also sought to limit Christine’s visitation rights due to her recent arrest for felony drug charges.
 

 This second action concerning the custody of the child never went to trial. Instead, the trial court signed another consent judgment in September 2005. The court expanded and modified Christopher’s visitation rights to include every other weekend and every Wednesday evening visitation. Christopher was also granted visitation with Cody for one-half of the |sChristmas and Thanksgiving holidays and every other week during the months of June and July of each year.
 

 Subsequently, this action commenced in September 2006, with Christopher’s filing of a second rule to change custody against the Grandparents. Christopher argued that the further development of his relationship with his son due to consistent visitation and “the facts enumerated” in his prior rule to change custody, justified his primary custody of Cody with reasonable visitation in the Grandparents. Christopher requested that a mental health expert be appointed to evaluate the parties. The trial court signed an order granting the mental health expert evaluation on February 5, 2007.
 

 Trial of this matter occurred over a four-day period in November 2008. The court-appointed mental health expert who evaluated the parties, Dr. Bruce McCormick, was the first to testify. Dr. McCormick interviewed the Grandparents, Christopher and Christopher’s wife. He also observed the child in the presence of the adults and concluded that he was familiar with and comfortable in the presence of both his father and the Grandparents. The psychological evaluations of the child revealed him to be a “normal, healthy kid.” Dr. McCormick testified that he was “convinced that all of the adults ... genuinely love Cody.” He concluded that it would be “distressing” for Cody to be deprived of
 
 *157
 
 contact with the parties. Dr. McCormick saw no difference in the parties’ capacity to provide love, guidance, food, shelter and medical care to Cody but stated that it was the Grandparents’ home which had provided the stable environment for the | ¿child virtually his entire life. Dr. McCormick concluded that Cody has had “a grandfather and a grandmother that were functional parents, [whom] ... he has bonded with and loves like functional parents.”
 

 Relevant to the issue of the parties’ ability to facilitate a relationship among themselves, Dr. McCormick testified that while the parties were able to foster the relationship, they struggled with a willingness to do so. He noted the Grandparents’ distrust of Christopher and their difficulty in facilitating a relationship with him which he rooted in a “genuine, honest concern for the child that ends up having the effect of restricting information and perhaps restricting contact.” Dr. McCormick stated that Christopher expressed more of a willingness to nurture Cody’s relationship with the Grandparents. Ultimately, Dr. McCormick concluded that the child was “close to being the rope in a tug-of-war, and he doesn’t need to be pulled on so hard. He needs to have some resolution.”
 

 Dr. McCormick refused to make a recommendation as to what placement would be in the best interest of Cody. He stated that “this child could do very well with both parents — both households — and both households want him.” However, when pressed by the trial court, Dr. McCormick .stated that the child’s interest might best be served by the father having custody. He based this on his belief that “the child may be a little better off having give-and-take with some siblings, and maybe sometimes get in trouble because he didn’t get his homework done because the parents were a little too busy to make sure it got done.” Dr. McCormick testified that these | .-.circumstances did not exist in the Grandparents’ home because they tended to dote upon the child.
 

 Christopher conceded that at the time of Cody’s birth he was not in a place to take care of a child, although he believed that the agreed-to custody arrangement was temporary. Christopher testified that he was gainfully employed and had remarried at the time of trial. His wife’s 17-year-old son lived with them and got along very well with Cody. Christopher has been faithful to exercise his visitation rights since obtaining them. He believed that Cody’s best interest would be served by his living with him with substantial visitation rights to be given to the Grandparents.
 

 Anne Coleman, Christopher’s wife, testified that Cody is very comfortable with her home and that Cody and his father have a good relationship which has developed over the years. She admitted that communication between the Grandparents and Christopher has been a problem.
 

 Robert and Sharon Jones also testified at trial. Robert is self-employed and owns an awning company; he has had the business. for 30 years. Robert agreed that the parties have trouble communicating, although he blamed Christopher. Robert conceded that Christopher has changed for the better and become a lot more responsible. His visitation with his son has been consistent, and he desires Christopher to have a relationship with Cody. Sharon corroborated the testimony of Robert adding that she and Robert maintain apprehension about Christopher’s judgment and parenting skills.
 

 | (After considering the evidence and testimony, the trial court denied Christopher’s request for custody of Cody. The court did modify Christopher’s visitation arrangement, allowing alternating over
 
 *158
 
 night Wednesday visitation and rotating two-week visitation for the first eight weeks of the summer and alternating one-week visitation for the remainder of the summer. The court also minimally altered the holiday schedule. For purposes of resolving the communication disputes that existed between the parties, the court appointed a parenting coordinator for a one-year term.
 

 In an oral ruling, the trial court noted as follows:
 

 In looking at the case law what has to be proven before I even get to make that determination, a material change of facts and then the purposed [sic] change would be in the best interest of the child. I think there has been a change of facts in that Mr. Coleman has now remarried. I don’t think that’s material facts to change the custody decree, but I do think, in my opinion, Mr. Coleman has got his life together much better now than it was six years ago. So I think — could be iffy but I think it’s enough to say that there has been a change of facts.
 

 But the big burden is that the proposed modification is in the best interest of the child. I’ve gone back to the statute several times, and Dr. McCormick’s report goes down the original statute factors and analyzes them, and does a good job of that I think. But the one that stands out that glares to me is that the Grandparents, although the problems are there, have done from what I see here in the court have done an excellent job with Cody.... I think the child is doing well where he is....
 

 * ⅜ *
 

 I’m not going to change the custody. I’m going to leave the custody as it is.
 

 It is from this judgment that Christopher appeals.
 

 Discussion
 

 On appeal Christopher argues that the trial court erred in failing to give special weight to his “parental primacy” in its determination of custody 17between a parent and a nonparent
 
 [1]
 
 thereby denying him due process of law. Christopher also argues that the trial court erred in failing to make the custody determination without considering whether Christopher’s acquisition of custody of Cody would result in substantial harm to the child. These arguments require review of the constitutionally protected primacy of the parental right of custody, the Civil Code’s provision for the parent’s loss of custody in favor of a nonparent, and most significant for this decision, the applicable burden of proof for any change of the nonparent’s custody after a prior judgment establishing such custody over the parent’s paramount right.
 

 The interest of a parent in having a relationship with his children is manifestly a liberty interest that has long been protected by the Fourteenth Amendment’s due process guarantee.
 
 Meyer v. Nebraska,
 
 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923);
 
 Prince v. Massachusetts,
 
 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944);
 
 Troxel v. Granville,
 
 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This liberty interest includes the right of parents to establish a home and bring up children and to control the education of their own.
 
 Id.
 

 
 *159
 
 The United States Supreme Court has declared it “plain beyond the need for multiple citation” that a biological parent’s right to “the companionship, care, custody, and management” of his children is a liberty interest far more important than any property right.
 
 In re Adoption of B.G.S.,
 
 556 So.2d 545 (La.1990), citing
 
 Santosky v. Kramer,
 
 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and
 
 Lassiter v. Department of Social Services of Durham County, N.C.,
 
 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Even when the natural father has not lived continuously with his child, he enjoys a similar constitutional protection of his paternal interest when he develops and maintains a substantial relationship with his child by accepting responsibility for the child’s future.
 
 In re Adoption of B.G.S., supra,
 
 citing
 
 Lehr v. Robertson,
 
 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
 

 The provisions of La. C.C. art. 133 (“Article 133”) address the issue of an award of a child’s custody to a person other than the parent:
 

 If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
 

 When the parent competes with a nonpar-ent of the child, the parent’s right to custody is superior unless the parent is unable or unfit, having forfeited parental rights.
 
 Wood v. Beard,
 
 290 So.2d 675 (La.1974).
 

 The concept of substantial harm under Article 133 includes parental unfitness, neglect, abuse, abandonment of rights, and is broad enough to include “any other circumstances, such as prolonged separation of the child from its natural parents, that would cause the child to suffer substantial harm.”
 
 Mills v. Wilkerson,
 
 34,694 (La.App. 2d Cir.3/26/01), 785 So.2d 69, citing
 
 Hughes v. McKenzie,
 
 539 So.2d 965 (La.App. 2d Cir.1989). This continuum for “substantial harm” is wide ranging. Yet, there is obvious difference between a parent who has physically abused his child |9and one whose immaturity and neglect for the child makes him emotionally and economically unfit to care for the child. Christopher’s assertion of his rehabilitation in this case involves rehabilitation from his immaturity/ unfitness which previously posed as a substantial harm threat to the child.
 

 In the context of actual physical abuse or substantial neglect prosecuted under Title 10 of the Children’s Code, where specific termination of parental rights may occur, this court has discussed the parallel policy considerations which likewise underlie custody adjudications under Article 133, as follows:
 

 In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children. These interests warrant great deference and require full, vigilant due process protection that fair procedure be followed when the state seeks to terminate the parent-child legal relationship. Balanced against those protections is the child’s profound interest in terminating parental rights which prevent adoption, and hamper the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing the parents’ and the child’s interests, the courts of this state have consistently found the
 
 *160
 
 interests of the child to be paramount over those of the parents.
 

 State ex rel. C.M.M. v. T.P.M.,
 
 42,238 (La.App.2d Cir.5/9/07), 957 So.2d
 
 330,
 
 citing
 
 State ex rel. L.B. v. G.B.B.,
 
 02-1715 (La.12/4/02), 831 So.2d 918.
 

 The overriding test for any determination of child custody in Louisiana is the best interest of the child. La. C.C. art. 131;
 
 Evans v. Lungrin,
 
 97-0541 (La.2/6/98), 708 So.2d 731. Two of the many factors which the trial court considers for determining the best interests of the child are set forth in La. C.C. art. 134, as follows:
 

 | ]n(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
 

 * ⅛ ⅜
 

 (12) The responsibility for the care and rearing of the child previously exercised by each party.
 

 Under Article 133, these important criteria are significantly highlighted for the measure of the nonparent recipient of the child’s custody. The nonparent “with whom the child has been living in a wholesome and stable environment” or a non-parent who is “able to provide an adequate and stable environment” is expressly recognized as the proper recipient of the child’s custody. These factors concerning a wholesome and stable environment for the child must also have particular importance in addressing a parent’s later challenge to the nonparent’s previously adjudicated custody award under Article 133. Even in the absence of any prior adjudication of custody in the nonparent, the Louisiana Supreme Court in early rulings elevated the best interest of the child test and these stable environmental factors in rejecting parental primacy claims against the nonparent with whom the child had resided.
 
 State ex rel. Paul v. Peniston,
 
 235 La. 579, 105 So.2d 228 (1958);
 
 State ex rel. Graham v. Garrard,
 
 213 La. 318, 34 So.2d 792 (1948).
 

 Despite the reverberations of unconstitutionality throughout Christopher’s brief concerning his claimed denial of parental primacy, he does not argue that the “substantial harm” test of Article 133 cannot be constitutionally applied to override or cause forfeiture of the parent’s paramount right to custody. Instead, he argues that “a parent’s right to rehabilitate cannot be denied,” implying that even after the loss of parental custody by a constitutionally acceptable adjudication of substantial harm, a |n nonparent’s custody award under the authority of Article 133 might still be changed or ended merely by the special weight of the biological connection.
 

 From our review of the jurisprudence regarding modification of the non-parent’s custody, the courts of appeal have struggled with a parent’s claim, such as Christopher’s, to obtain primary custody of a child who has been legally in the custody of a nonparent in a stable environment. While the best interest of the child is the overriding principle, the burden of proof placed on either the parent or nonparent and the nature of the proof necessary for modification of the nonpar-ent’s custody have not been consistently expressed. Some cases have drawn upon the jurisprudentially developed auxiliary rules for the modification of existing joint custody decrees between the parents, namely, the material change in circumstances test for prior nonconsidered decrees
 
 [2]
 
 under
 
 Evans v. Lungrin,
 
 supra,
 
 *161
 
 and the heavy burden test for prior considered decrees addressed in
 
 Bergeron v. Bergeron,
 
 492 So.2d 1193 (La.1986).
 
 Hill v. Hill,
 
 602 So.2d 287 (La.App. 2d Cir.1992);
 
 Sheppard v. Hood,
 
 605 So.2d 708 (La.App. 2d Cir.1992);
 
 State in the Interest of C.G.,
 
 609 So.2d 1049 (La.App. 2d Cir.1993),
 
 writ denied,
 
 612 So.2d 85 (La.1993);
 
 Mayeaux v. Mayeaux,
 
 536 So.2d 836 (La.App. 1st Cir.1988);
 
 Millet v. Andrasko,
 
 93-0520 (La.App. 1st Cir.1994), 640 So.2d 368;
 
 Robert v. Gaudet,
 
 96-2506 (La.App. 1st Cir.3/27/97), 691 So.2d 780;
 
 In re Varner, supra note 2; Matter of Landrum,
 
 97-826 (La.App. 3d Cir.12/10/97), 704 So.2d 872. Under this line of 112cases, the parent always would have the burden of proof to modify the custody of the nonparent, whether a considered or noneonsidered decree had previously determined the custody in the nonparent. Likewise, because the prior “substantial harm” proceeding and decree awarded custody to the nonparent over the parent, there is recognition that parental primacy no longer carries the same weight due to the accrual of factors in the custodial environment that have developed with the nonparent for the child’s best interests.
 
 McCoy v. Brock,
 
 41,948 (La.App. 2d Cir.2/28/07), 953 So.2d 885, 889;
 
 In re Varner, supra.
 

 However, in other cases, after a noncon-sidered decree had granted custody to a nonparent, decisions have emphasized the parent’s paramount right of custody of a child and placed the burden of proof on the defendant/nonparent in the parent’s action to modify custody. The burden of proof placed on the nonparent in these cases is to continue to show that a custody award to the parent would result in substantial harm to the child.
 
 Tennessee v. Campbell,
 
 28,823 (La.App. 2d Cir.10/30/96), 682 So.2d 1274;
 
 Cutts v. Cutts,
 
 06-33 (La.App. 3d Cir.5/24/06), 931 So.2d 467.
 
 See also, Mills v. Wilkerson, supra.
 

 In
 
 Tennessee v. Campbell, supra,
 
 this court required this burden of proof of the nonparent and reversed the trial court judgment which had maintained sole custody of the eleven-year old child with his grandmother who had raised him since birth. The district court had also granted the father expanded visitation. This court’s reversal granted sole custody to the | ^father after he had rehabilitated himself and started a relationship with the child.
 
 [3]
 

 In
 
 Cutts v. Cutts, supra,
 
 the Third Circuit affirmed the trial court judgment which awarded custody to the mother of the child who by prior consent judgment had been placed with the grandparents. The court relied partially on
 
 Tennessee v. Campbell, supra,
 
 and determined that the grandparents had not met their burden of showing that the award of custody would result in substantial harm to the child.
 
 *162
 
 The court ruled that “the burden in a custody dispute between a parent and non-parent does not rest with the parent. This must be the case if we are to view parental primacy as a primary factor in determining the best interests of a child.”
 
 Id.
 
 at 471.
 

 Notably, the
 
 Tennessee
 
 ruling acknowledged that the heavy burden test of
 
 Ber-geron
 
 remained on any parent seeking custody of the child awarded to the non parent by a previous considered decree. That test requires either (i) a showing that the continuation of the present custody in the nonparent is so deleterious to the child as to justify a modification of custody or (ii) proof by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by the advantages a change affords the child.
 
 Bergeron v. Bergeron, supra.
 
 Thus,_J_|4with a prior considered decree, the emphasis in
 
 Tennessee
 
 on parental primacy and the rehabilitation of the previously unfit father would not have been the focus. Despite the best interests of the child ruling in
 
 Tennessee
 
 placing custody in the father, that same father would not have obtained custody with his exemplary rehabilitation and for the best interests of the child had the prior custody order in favor of the grandmother been a considered decree and the heavy burden test of
 
 Bergeron
 
 been placed on the father. See also,
 
 State in Interest of C.G., supra,
 
 and
 
 Sheppard v. Hood, supra,
 
 applying the
 
 Bergeron
 
 test against a parent seeking modification of the nonparent’s custody.
 

 With this conflict and struggle reflected in the jurisprudence, we will rest our analysis for the applicable burden of proof for any modification of the nonparent’s custody solely on Article 133 and the clear implications of its two-pronged test regarding substantial harm of the parent and the adequate and stable environment of the nonparent. For the following reasons, in this nonparent setting governed by Article 133, we will no longer utilize the juris-prudentially developed auxiliary rules for custody modification which the courts have crafted for changes to the joint custody of parents for their children.
 

 In the first place, the import of the initial “substantial harm” action to wrest custody away from the parent in favor of the nonparent is significantly different
 
 from
 
 the parent’s initial custody proceeding to allocate their joint custody rights. In the parent’s proceedings following divorce, neither parent would be expected to pose a “substantial harm” threat to the child, |1snor would sole custody in one parent generally be the outcome. Instead, both parents can be a custodian and serve the best interests of the child. Thus, under Civil Code Article 132, while joint custody is no longer presumed, “it is mandated absent an appropriate parental agreement for another custodial arrangement.”
 
 Evans v. Lungrin, supra
 
 at 736, citing Kenneth Rigby,
 
 1993 Custody and Child Support Legislation,
 
 55 La. L.Rev. 103, 109 (1994). Under La. C.C. art. 132, the parent’s agreement for a custodial arrangement is controlling, and no evidence of parental fitness need be taken. La. C.C. art. 132, Comment (a);
 
 Evans v. Lungrin, supra.
 
 Unless the best interest of the child requires a different award, Article 132 mandates that the court accept the parent’s agreement for the parental sharing of custody which is settled outside the courtroom. In keeping with that important policy to encourage agreement and discourage custody battles,
 
 Evans v. Lungrin
 
 allows either parent to later seek modification of their stipulated custody arrangement without the heavy
 
 Bergeron
 
 burden of proof.
 
 Evans v. Lungrin
 
 requires that the party seeking modification to prove (1) that there has been a material change in circumstances since the original custody decree was en
 
 *163
 
 tered, and (2) that the proposed modification is in the best interest of the child.
 
 Id.
 
 at 738.
 

 In contrast, the custody award at issue when the Grandparents first instituted this action against Christopher in 2002 could only be based, and was based, upon a cause of action to establish “substantial harm” under Article 133. The facts of parental fitness were therefore received by judicial admission and, the parent’s custody was determined to pose a substantial | ifiharm threat and forfeited. At the same time, the judgment for the nonparent’s custody of the child, whether by consent or after trial, must determine the nonparent as able to provide a wholesome and stable environment for the best interest of the child. Because of this forfeiture of parental custody and the transfer of custody to a nonparent, any judgment of the court under Article 133 is therefore more than a “nonconsidered” decree. The forced analogy to parental consent judgments, where both parties retained their right to custody, does not fit this setting. Accordingly, the consent judgment for a custody dispute between a nonparent and a parent has substantive effects that differ significantly from a consent decree for the parent’s sharing of joint custody.
 

 Next, rehabilitation of the unfit parent is a most worthy goal, particularly for the immature parent, who was unable to provide the emotional and economic support of the child at the time of the initial “substantial harm” proceedings. Rehabilitation therefore first concerns the parent’s change which restores his ability to act in a nurturing role for the child. Rehabilitation also concerns an establishment of a relationship with the child. In this regard, La. C.C. art. 136 allows parental visitation when that visitation would be in the best interest of the child. In this case, when the Grandparents’ custody was recognized by the initial judgment, Christopher’s visitation rights, while not rejected altogether, were undefined. Later, as rehabilitation occurred, Christopher sought and obtained more liberal visitation, until at the time of trial his visitation was | ^virtually the same as that of a non-domiciliary parent under a joint custody arrangement.
 

 From these considerations, we conclude that the jurisprudentially developed auxiliary rules of
 
 Evans
 
 and
 
 Bergeron
 
 for modification of parental joint custody decrees do not match the purpose and concerns of Article 133 and do not promote agreement between the parent and nonparent and the possibility for parental rehabilitation. A nonparent generally does not become involved in the care and custody of someone’s child unless that parent is clearly exhibiting parental unfitness and/or abandonment of the child. The parties are not in an equal bargaining position for compromise regarding the joint custody of the child because the parent has forfeited away any position of care and custody of the child. Therefore, if the considered versus nonconsidered decree dichotomy for the measure of the importance of the initial custody award is applied in this setting, the nonparent would be advised in most cases not to accept the parent’s stipulations for a consent decree and to present evidence to the court of the parent’s unfitness or abandonment of the child and evidence of the nonparent’s wholesome and stable environment. This would virtually insure no further modification of the non-parent’s custody because of the applicability of the heavy burden test of
 
 Bergeron.
 

 Furthermore, if a consent decree concerning the parent’s relinquishment of custody has occurred and will lessen the measure of any future modification in the nonparent’s custody, the nonparent with custody under such decree will recognize that the parent’s rehabilitation, including | ^increased visitation with the child, ere-
 
 *164
 
 ates a possible “material change in circumstances” opening the door for a change of custody hearing and the application of the
 
 Evans v. Lungrin
 
 test. See,
 
 In re Varner, supra
 
 (where the court found that the parent’s rehabilitation was a material change in circumstances). This will cause the nonparent’s resistance to the favorable goal of rehabilitation, which indeed has occurred in the present case. If the
 
 Evans v. Lungrin
 
 test is applied and a material change in circumstances occurs because of the parent’s rehabilitation, the parent may then seek primary custody on an equal footing with the nonparent as though he had been in joint custody of the child all along when, in fact, he has not had custody.
 
 [4]
 

 In summary, we therefore hold that the initial judgment under Article 133, placing custody of the child with a nonpar-ent, is a determination of the unfitness of the parent and the fitness of the nonparent to provide an adequate and stable environment. The considered versus nonconsid-ered decree analysis under
 
 Evans
 
 and
 
 Bergeron
 
 does not apply for the consideration of the initial judgment’s effect in any future action for the modification of the nonparent’s custody. In any proceeding thereafter to restore custody of the child to the parent, and to thereby modify or end the nonparent’s custody, the parent shall have the burden of proof and the dual tests of Article 133 shall apply. First, the parent must demonstrate his [ ^rehabilitation which eliminates the “substantial harm” threat to the child which existed at the time of the initial judgment. Second, the parent must establish that the adequate and stable environment in which the child was placed with the nonparent as a result of the initial adjudication has materially changed. In the absence of such a change, the parent’s claim to modify the nonparent’s custody of the child shall not prevail, and the rehabilitation of the parent alone shall afford him only an appropriate visitation allowance under La. C.C. art. 136.
 

 Under this measure which comports with the legislative expressions of Article 133, we affirm the trial court’s ruling to maintain the child in the custody of the Grandparents. Christopher produced no evidence which demonstrated that the family environment which the Grandparents had provided Cody immediately after his birth had changed and become unstable and inadequate to continue to serve the best interests of the child. The strength of Christopher’s rehabilitation, which properly now affords him liberal visitation, does not establish by itself the requisite proof under Article 133 to modify the prior adjudication of custody. The Grandparents’ adequate and stable environment, judicially considered and recognized under Article 133 when Christopher’s parental custody was appropriately ended, has not been sufficiently challenged in this proceeding due to the continuity of the wholesome environment which Cody has received.
 

 Conclusion
 

 For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Christopher.
 

 AFFIRMED.
 

 [1]
 

 . We will utilize the singular nouns, parent and nonparent, in our discussion of the law herein even though on many occasions, including the present, the recipients of a child's custody are a married couple and both parents are involved in the forfeiture of parental rights.
 

 [2]
 

 . A nonconsidercd decree is one in which no evidence is presented as to the fitness of the parents, such as one that is entered by default, by stipulation or consent of the parties,
 
 *161
 
 or is otherwise not contested.
 
 In re Varner,
 
 07-0656 (La.App. 1st Cir.9/14/07), 2007 WL 2685584.
 

 [3]
 

 . In
 
 Mills v. Wilkerson, supra,
 
 this court again stated the nonparent’s burden of proof set forth in
 
 Tennessee v. Campbell, supra,
 
 in reversing the trial court judgment which granted sole custody of an eight-year-old child who had been in joint custody of father and grandparents for four years under a noneonsidered decree.
 
 Mills
 
 reinstated the prior joint custody noneonsidered decree with domiciliary custody given to the grandparents because evidence showed that the child would experience a deep sense of loss and abandonment and lasting psychological trauma if placed in the father’s sole custody. Although applying the
 
 Tennessee v. Campbell, supra,
 
 standard to the nonparenls, the writing judge in a separate footnote acknowledged that this court had previously held that the party seeking modification had the burden of proof in
 
 Hill v. Hill, supra,
 
 and expressed his belief that
 
 Evans v. Lungrin, supra,
 
 may have enunciated “a uniform standard applicable to all actions to modify noneonsidered decrees of custody.”
 

 [4]
 

 . In lilis case, in ils reasons for judgment expressed in open court as quoted above, the trial court was reluctant to rule that Christopher’s rehabilitation was a "material change in circumstances” and did not place the parties on equal footing and weigh each of the factors for the best interest of the child under La. C.C. art. 134. Instead, the ruling centered on the stability of the Grandparents' custodial environment and the desirability of maintaining the continuity of that environment.